**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 6 2001**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

RICCO DEVON PRENTISS,

    Defendant-Appellant.

No. 98-2040

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. CR-97-344-JC)**

Norman C. Bay, United States Attorney (Richard A. Friedman, Appellate Section, Criminal Division, Jason Bowles and Fred J. Federici, Assistant United States Attorneys, with him on the briefs), Albuquerque, New Mexico, for Plaintiff-Appellee.

Michael A. Keefe, Assistant Federal Public Defender, Albuquerque, New Mexico, for Defendant-Appellant.

Before **HENRY**, **BALDOCK**, and **LUCERO,** Circuit Judges.

**HENRY**, Circuit Judge.

    The defendant Ricco Prentiss was convicted after a jury trial of arson in Indian country, in violation of 18 U.S.C. §§ 81 and 1152. A divided panel vacated the conviction, holding that: (1) the indictment failed to allege two essential elements of the

offense (the Indian/non-Indian statuses of the victim and the defendant); and (2) that the indictment's deficiency was not subject to review for harmless error. See United States v. Prentiss, 206 F.3d 960, 966-77 (10th Cir. 2000) ("Prentiss I"). On rehearing en banc, a majority of this court agreed with the panel's conclusion that the status of the victim and that of the defendant are essential elements of the crime of arson in Indian country under 18 U.S.C. §§ 81 and 1152. However, a majority further concluded that the indictment's failure to allege these elements was subject to review for harmless error. Thus, it remanded the case to this panel to determine "[w]hether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" United States v. Prentiss, 256 F.3d 971, 985 (10th Cir. 2001) (en banc) ("Prentiss II") (quoting Neder v. United States, 527 U.S. 1, 15 (1999) (quoting Chapman v. California, 386 U.S. 18, 24 (1967))). Thus, the question before us is whether the omitted elements were "uncontested and supported by overwhelming evidence." Neder, 527 U.S. at 17.

Upon review of the record, we conclude that the evidence was not overwhelming and that the government has failed to establish beyond a reasonable doubt that the indictment's deficiencies "did not contribute to the verdict obtained." Id. Because this error was not harmless, we vacate Mr. Prentiss's conviction.

## I. BACKGROUND

As noted in our prior opinion, 18 U.S.C. § 1152 establishes federal jurisdiction

over "interracial" crimes, those in which the defendant is an Indian and the victim is a non-Indian, or vice-versa. See Prentiss I, 206 F.3d at 966; see also Felix S. Cohen's Handbook of Federal Indian Law at 291 (Rennard Strickland et al. ed., 1982); Robert N. Clinton, Criminal Jurisdiction over Indian Lands: A Journey Through a Jurisdictional Maze, 18 Ariz. L. Rev. 503, 526-27 (1976). Although the indictment in this case did not specify the status of either the victim or the defendant, the government now points to evidence regarding both elements.

With regard to the victim, the government observes that the parties presented the following stipulation to the jury:

> [1] the residence located at Route 11, Box 50 TP, Tesuque
> Pueblo, New Mexico, which defendant Ricco Devon Prentiss
> resided on November 22 and 23rd, 1996 is within the
> confines of the Tesuque Pueblo in Indian country[;] [2] the
> above described residence owned by Domingo Vigil who is a
> member of the Tesuque Pueblo[;] [sic] [3] this stipulation
> may be entered into evidence as a trial exhibit.

Rec. vol. III, at 327. The named residence was the one involved in the alleged arson.

After reading the stipulation, the trial judge asked, "So this takes from the jury the question of whether this occurred on Indian land; is that correct?' Id. (emphasis added). The prosecutor replied, "Yes, Your Honor, this is under 18 U.S.C. § 1152." Id. The court then stated, "Well, okay, so part of the . . . instructions I'll give you . . . will say that this incident occurred within the exterior boundaries of the Tesuque Pueblo in Indian country, and that will be–that's one of the elements that the government has to prove, so

3

that part of it has now been proved by this stipulation the parties entered into.  So it's no longer a question that you all say,  [']Well, was this Indian land or not?['] It was on Indian land."  Id. at 327-28 (emphasis added).

The court's instructions to the jury adopted this approach.  They stated:

> [i]n order for you to find the defendant guilty of arson as charged in the indictment, you must be convinced that the government has proven beyond a reasonable doubt each of the following elements: (1) [t]he defendant set fire to or burned, or attempted to set fire to or burn, a building or structure[;] (2) [t]hat building was within the territorial jurisdiction of the United States[;] (3) [i]n setting the fire or in burning the building or structure, the defendant acted willfully or maliciously.  You are instructed that the Tesuque Pueblo is within the territorial jurisdiction of the United States.

Rec. vol. I, doc. 47, Inst. 8D.

Aside from the stipulation, the only other evidence noted by the government as to the Indian status of the alleged victims is brief testimony that Mr. Vigil and Cynthia Dorame were members of the Tesuque Pueblo.  See Aple's Br., filed July 28, 1998, at 20 (stating that "Lieutenant Vigil of the Tesuque Pueblo Police Department testified that both Prentiss's wife, Cynthia Dorame, who lived in the house, and Domingo Vigil, who owned the house, were members of the Pueblo" and that Ms. Dorame testified that she was a member of the Pueblo).

As to the status of Mr. Prentiss, the government relies solely on the testimony of Lieutenant Vigil.  He stated that Mr. Prentiss was not a member of the Tesuque Pueblo.

4

## II. DISCUSSION

In light of this evidence, the government maintains, the indictment's failure to allege the Indian/non-Indian statuses of the victim and the defendant did not contribute to the jury's determination that Mr. Prentiss violated 18 U.S.C. §§ 81 and 1152. In order to prevail on that argument, the government is required to demonstrate that, in light of the evidence presented at trial, "no jury could reasonably find" that the victim of the crime was not an Indian and that Mr. Prentiss was not a non-Indian. See Neder, 527 U.S. at 16. In other words, "the[se] omitted element[s] [must be] uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error." Id. at 17; see also United States v. Mojica-Baez, 229 F.3d 292, 311 (1st Cir. 2000) (concluding that an indictment's failure to allege an element of an offense was harmless because "[t]here is no question that the petit jury would have found [the omitted element]" had it been asked to do so), cert. denied, 121 S. Ct. 2215 (2001).[1]

The government's argument turns on the meaning of the term "Indian" under § 1152. As the parties note, that term is not defined in the statute or in related statutes addressing criminal jurisdiction in Indian country. See Cohen, supra, at 24 (stating that "[s]everal important Indian statutes, such as the federal criminal jurisdiction statutes, . . .

---

[1] In his concurring and dissenting opinion in Neder, Justice Scalia sets forth a similar test for harmless error. See Neder, 527 U.S. at 35 (Scalia, J., concurring in part and dissenting in part) ("Where the facts necessarily found by the jury (and not those merely discerned by the appellate court) support the existence of the element omitted or misdescribed in the instruction, the omission or misdescription is harmless.").

5

use the word 'Indian' without further definition."); Clinton, supra, at 513 (stating that "the question of Indian status for purposes of criminal jurisdiction is perplexing" and that "[n]o statutory definition currently exists to guide courts and practitioners in determining Indian status under the federal criminal jurisdiction statutes").

In the absence of a statutory definition, this circuit has applied a two-part test for determining whether a person is an Indian for the purpose of establishing federal jurisdiction over crimes in Indian country. We have concluded that, "[f]or a criminal defendant to be subject to § 1153, the court must make factual findings that the defendant '(1) has some Indian blood; and (2) is recognized as an Indian by a tribe or by the federal government.'" Scrivner v. Tansy, 68 F.3d 1234, 1241 (10th Cir. 1995) (quoting United States v. Lawrence, 51 F.3d 150, 152 (8th Cir. 1995)).[2] That two-part test has been applied by many other courts. See, e.g., United States v. Keys, 103 F.3d 758, 761 (9th Cir. 1996) (applying two-part test in order to determine the status of the victim in a prosecution under § 1152); United States v. Torres, 733 F.2d 449, 456 (7th Cir. 1984) (concluding that jury instruction setting forth that test was "in accord with present Federal law" regarding "what constitutes an Indian for purposes of 18 U.S.C. § 1153"); United

---

[2] Even though Scrivner concerned a prosecution under § 1153 rather than § 1152, courts and scholars have applied the same definition of Indian status to both statutes. Here, the government does not argue that a different test for determining Indian status should be applied to these two statutes. As a result, we conclude that the decisions applying the two-part test for Indian status under § 1153 are relevant to determining the proper approach under § 1152.

6

States v. Broncheau, 597 F.2d 1260, 1263 (9th Cir. 1979) (applying § 1153 and stating that "the term 'Indian'" . . . has been judicially explicated over the years" and that the two-part test has been "generally followed by the courts"); St. Cloud v. United States, 702 F. Supp. 1456, 1460 (D.S.D. 1988) (applying two-part test); State v. Sebastian, 701 A.2d 13, 23-27 (Conn. 1997) (applying two part test and stating that "[g]enerally, the first so-called racial prong of this test must be met as well as the second, non-racial prong"); Lapier v. McCormick, 790 P.2d 983, 986 (Mont. 1990) ("expressly adopt[ing]" the two-part test, rejecting the defendant's argument that he was an Indian, and concluding that, as a result, the state court had jurisdiction over a criminal prosecution ); see generally Cohen, supra, at 24 ("Lacking criteria other than the words of the statute, the courts have taken the position in this situation that the term 'Indian' means an individual who has Indian blood and who is regarded as an Indian by his or her tribe or Indian community."). A leading scholar has expressed support for this approach. See Clinton, supra, at 520 ("[T]he inquiry in all cases where Indian status is in issue for jurisdictional purposes should be whether the person has some demonstrable biological identification as an Indian and has been socially or legally recognized as an Indian.") (emphasis added).

The two-part test is derived from United States v. Rogers, 45 U.S. (4 How.) 567 (1846). Interpreting a predecessor of § 1152, the Supreme Court held that the defendant's adoption into an Indian tribe as an adult did not establish that he was an Indian for purposes of establishing federal criminal jurisdiction over a crime committed in Indian

7

country.  See id. at 573-74.  Thus, to the Court in Rogers, the fact that the defendant had been recognized as an Indian by a tribe was not sufficient to prove his Indian status; some evidence of Indian blood was also necessary.  See id. at 573 (stating that the term 'Indian' "does not speak of members of the tribe, but of the race generally").

In its supplemental brief, the government argues that the two-part test for determining Indian status is not appropriate.  Citing the Supreme Court's decision in United States v. Antelope, 430 U.S. 641 (1977), the government maintains that "proof of one's relationship with a tribe as a political entity, not blood, constitutes the quintessence of what it means to be an 'Indian.'" Aple's Supl. Br. at 7.  Because the parties stipulated that Mr. Vigil, the owner of the burned residence, was a member of the Tesuque Pueblo, and because of testimony that Mr. Vigil and Ms. Dorame were both members of the pueblo, the government contends that the indictment's failure to allege the Indian/non-Indian statuses of Mr. Vigil and Mr. Prentiss was harmless.[3]

---

[3] In particular, the government contends that, regardless of whether Mr. Prentiss is an Indian or a non-Indian, the fact that Mr. Vigil is a member of the Tesuque Pueblo is sufficient to establish federal jurisdiction.  According to the government, if Mr. Prentiss is a non-Indian, then jurisdiction is provided by § 1152; on the other hand, if Mr. Prentiss is an Indian, then jurisdiction is provided by 18 U.S.C. § 1153.  See United States v. Heath, 509 F.2d 16, 20 (9th Cir. 1974) (concluding that an indictment citing § 1153 and alleging that the victim and the defendant were Indians was sufficient to support a conviction under §1152 when the evidence at trial revealed that the defendant's tribal rights had been terminated).  In light of our conclusion that the two-part test is applicable and that the government has not established the victims' Indian status under that test, we need not address the government's contention that the victims' Indian status renders Mr. Prentiss's status irrelevant.

In Antelope, the government charged the defendants, enrolled members of an Indian tribe, with felony murder in Indian country pursuant to 18 U.S.C. § 1153 and the federal murder statute, 18 U.S.C. § 1111. Following the guilty verdicts, the defendants argued on appeal that their convictions were based on invidious racial discrimination. They reasoned that "a non-Indian charged with precisely the same offense, namely the murder of another non-Indian within Indian country, would have been subject to prosecution only under Idaho law, which, in contrast to the federal murder statute, 18 U.S.C. § 1111, does not contain a felony-murder provision." Antelope, 430 U.S. at 644. Thus, in a state court prosecution of a non-Indian for first-degree murder, the government would be required to prove premeditation and deliberation, elements not required for a conviction under § 1111. Thus, the defendants concluded, the federal statute treated defendants differently on the basis of their race.

In rejecting that argument, the Supreme Court held that federal regulation of Indian affairs is not based on an unlawful racial classification:

> [F]ederal regulation of Indian affairs is not based upon impermissible classifications. Rather, such regulation is rooted in the unique status of Indians as a separate people with their own political institutions. Federal regulation of Indian tribes, therefore, is governance of once-sovereign political communities; it is not to be viewed as legislation of a racial group consisting of Indians. Indeed, respondents were not subjected to federal criminal jurisdiction because they are of the Indian race but because they are enrolled members of the Coeur d'Alene Tribe.

Id. at 646 (internal quotation marks and citations omitted).

9

According to the government, this reasoning indicates that the two-part test for determining Indian status is not controlling and that any inquiry into an individual's degree of Indian blood is no longer relevant. For several reasons, we are not convinced.

First, the Supreme Court's opinion in <u>Antelope</u> clearly does not address the question at issue: how one determines whether an individual is an Indian under the statutes establishing federal jurisdiction in Indian country. In <u>Antelope</u>, there was no question as to the defendants' Indian status. The issue was whether the entire statutory scheme constituted an invalid classification. Moreover, the government's reading of <u>Antelope</u> is inconsistent with <u>Rogers,</u> a case that is not discussed in <u>Antelope</u> and that has not been overruled.

Additionally, the government does not cite and we have not found any federal decisions issued after <u>Antelope</u> that have read that opinion to implicitly overrule the two-part test. Indeed, a number of post-<u>Antelope</u> decisions, including our decision in <u>Scrivner</u>, have continued to apply the two-part test derived from <u>Rogers</u>. See, e.g., <u>Scrivner</u>, 68 F.3d at 1241 (applying two-part test after <u>Antelope</u>); <u>Keys</u>, 103 F.3d at 761 (same); <u>Lawrence</u>, 51 F.3d at 152 (same); <u>Torres</u>, 733 F.2d at 456 (same). Some of these decisions even cite <u>Antelope</u> for other propositions. See, e.g., <u>Scrivner</u>, 68 F.3d at 1241 (citing <u>Antelope</u> for the principle that "the determination of whether one is subject to § 1153 is one of federal law"); <u>Keys</u>, 103 F.3d at 761 (rejecting argument that basing the determination of federal jurisdiction on the Indian status of the victim violated the Equal

Protection Clause and citing <u>Antelope</u>).

We acknowledge that the issue of how one ought to determine Indian status under the federal statutes governing crimes in Indian country is extraordinarily complex and involves a number of competing policy considerations. Thus, the government's argument that one should follow the Supreme Court's statement in <u>Antelope</u> and dispense with the "some Indian blood" component is appealing in some respects and troubling in others. In particular, some advocates of tribal sovereignty might argue that, by giving the tribe complete discretion in determining Indian status, such an enrollment-based test more closely mirrors the tribes' status as "a separate people, with the power of regulating their internal and social relations." <u>United States v. Wheeler</u>, 435 U.S. 313, 322 (1978) (internal quotation marks omitted). Others might respond that affording the tribes such broad discretion might deprive the states of jurisdiction over individuals not generally considered to be "Indian." In any event, in light of the fact that <u>Rogers</u> has not been overruled, our precedent applying the two-part test, the numerous decisions continuing to apply that test, and the view of scholars that "some demonstrable biological identification as an Indian" is an important component of determining Indian status in this context, <u>see</u> Clinton, <u>supra</u>, at 520, we conclude that the two-part test we applied in <u>Scrivner</u> should be applied here.

Applying that test, we further conclude that the trial record does not contain important evidence regarding the status of the victims. In particular, although the

11

government's theory was that Mr. Vigil (the owner of the residence) and Ms. Doame (Mr. Prentiss's wife) were the victims and were Indians, the government presented no evidence that either of them "ha[d] some Indian blood." See Scrivner, 68 F.3d at 1241. In that regard, this case differs from many others in which the prosecution did offer such evidence. See, e.g., Torres, 733 F.2d at 455 (noting that certificates of tribal enrollment set forth the degree of Indian blood possessed by the defendants and concluding that there was sufficient evidence that the defendants were Indians); United States v. Dodge, 538 F.2d 770, 786 (8th Cir. 1976) (discussing evidence that a defendant was listed on the tribal roll and had to have a certain amount of Indian blood to be so enrolled); United States v. Losiah, 537 F.2d 1250, 1251 (4th Cir. 1976) (noting that the government introduced a certificate of tribal enrollment indicating the degree of Indian blood possessed by the defendant). The evidence noted by the government—testimony that Mr. Vigil and Ms. Doame were members of the Tesuque Pueblo and a stipulation that Mr. Vigil was a member—does not itself establish that either of them had any Indian blood. Absent any evidence that Indian blood was one of the requirements for membership in the Tesuque Pueblo, the evidence on which the government relies does not establish that victims were Indians under § 1152.[4]

---

[4] Our decision does not foreclose reliance on tribal laws to prove Indian status. For example, if the government established: (a) that a tribe's constitution provided that some degree of Indian blood was a requirement for tribal membership, and (b) that the victim or the defendant was a tribal member, then such evidence, unless properly

(continued...)

12

As to Mr. Prentiss's status, important evidence is also lacking. The government's theory appears to be that Mr. Prentiss is a non-Indian and that, as a result of the victims' Indian status, federal jurisdiction is established by § 1152 because the crime was interracial. However, the only evidence of Mr. Prentiss's status was provided by the tribal law enforcement agent who merely testified that Mr. Prentiss was not a member of the Tesque Pueblo. Unfortunately for the government, the fact that a person is not a member of a particular pueblo does not establish that he or she is not an Indian under § 1152. See United States v. Romero, 136 F.3d 1268, 1274 (10th Cir. 1998) (concluding that victims' "names, appearance, speech, and testimony that they did not grow up on the Nambe Pueblo" did not establish that they were non-Indians under the "complex legal definition of Indian status" and reversing the defendants' convictions under § 1152).[5]

It is in some sense understandable that the trial record is insufficient. In light of the indictment's failure to allege the status of either the victim or the defendant, neither the prosecution nor the district court focused on these elements.[6] Because of these

---

[4](...continued)
controverted, would be sufficient to prove Indian status under § 1152. In this case, however, the government has not invoked the constitution or tribal laws of the Tesuque Pueblo.

[5] We note that Romero, which involved the same United States Attorney's office as the case at bar, cited cases applying the two-part test for determining Indian-status. See 136 F.3d at 1274.

[6] Thus, in explaining the purposes of the stipulation of Mr. Vigil's membership in the Tesuque Pueblo, the court stated that it eliminated the jury's obligation to determine
(continued...)

13

omissions from the trial record, however, the government has not met its burden of demonstrating beyond a reasonable doubt that the indictment's failure to allege all of the essential elements of the crime of arson in Indian country under 18 U.S.C. §§ 81 and 1151 "did not contribute to the verdict obtained." Neder, 527 U.S. at 15 (internal quotation marks omitted).

### III.  CONCLUSION

Accordingly, for the reasons set forth above, we VACATE Mr. Prentiss's conviction under 18 U.S.C. §§ 81 and 1152.[7]

Judge Baldock concurs in the result.

---

[6](...continued)
whether the crime occurred in Indian country.  However, the court made no reference to the jury's obligation to determine the status of the victim and the defendant.

[7] In light of our conclusion that the deficiency in the indictment was not harmless, we do not reach the other issues raised in Mr. Prentiss's appeal.

14